# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **United States of America** ) | |
| ) | |
| ) | |
| ) | |
| **v.** ) | No. 11 CR 887 |
| ) | Hon. Ronald A. Guzmán |
| ) | |
| ) | |
| **Dimitris Terry,** ) | |
| **also known as "D"** ) | |

## Memorandum Opinion and Order

Defendant, charged with possession, distribution, and conspiracy to possess and distribute heroin, has filed motions to suppress his post-arrest statements and evidence gathered as a result of the search of his home. (Doc. ## 79, 80.) An evidentiary hearing was held during which the Court heard testimony from: (1) DEA Special Agent James Laverty concerning the arrest of Mr. Terry and the search of his home; (2) DEA Special Agent Kris White concerning the arrest and interview of Mr. Terry; and (3) Mr. Terry concerning the arrest and interview. The Court now finds as follows.

On February 28, 2012 at approximately 9:45-9:50 a.m., the defendant was arrested pursuant to a warrant while parking a vehicle near his home at 2215 West

Monroe Street in Chicago, Illinois. After he was arrested, Mr. Terry was taken to 230 South Dearborn Street for processing and to be interviewed. At approximately 9:55 a.m., government agents executed a search warrant for defendant's home. The door was answered by a woman named Ena Carson, who was dressed in a bathrobe. The agents identified themselves to Ms. Carson, told her they had just arrested Dimitris Terry, and asked and were allowed to enter the home. Ms. Carson did not hesitate or express any reservations about letting the agents in, and she did not appear nervous. Special Agent James Laverty testified that, when Ms. Carson allowed them into the home, he believed that she lived there because it appeared that she had been there overnight, was dressed in a robe, answered the door, and had control of the residence which was otherwise unoccupied.

Once inside, the agent showed Ms. Carson a consent to search form (DEA Form 88, Gov't Ex. Consent to Search) and explained to her that they would like to search the residence as part of their investigation. Special Agent Laverty read the form to her and allowed her to read it for herself. After reading the form, Ms. Carson signed it at approximately 9:55 a.m., without asking any questions. Agent Laverty described Ms. Carson as alert and cooperative during this period of time.

As other agents searched the home, Agent Laverty interviewed Ms. Carson. It was at this point, after the consent form had been signed and the search had commenced, that Ms. Carson told him that she did not live at this address, but that

she had a child with Mr. Terry who lived there.  During the search, the telephone rang, and though Ms. Carson did not answer it, after looking at the number displayed, she said the caller was Mr. Terry's mother.  The search revealed that there were children's clothes and toys in some of the rooms, but no women's apparel was found.

Agent Laverty testified that Mr. Terry was not asked for permission to search his home, though he could have been asked at the time of his arrest.  He was also not asked if anyone lived with him, or if anyone else was in his residence at that time.  The arresting agent testified that they were trying to keep the arrest low-key to enhance the possibility that Mr. Terry would cooperate and be an informant for them.  Exposing him to an attention-getting public arrest would be detrimental to that effort.

Special Agent Kris White testified that he observed defendant's arrest, and afterward, at approximately 9:45 a.m., he went to 230 South Dearborn Street in Chicago, where he met with Special Agent Craig Schwartz. Together they interviewed Mr. Terry at approximately 10:15 a.m.  Initially, Agent Schwartz read DEA Form 13, *Miranda* warnings, to Mr. Terry line by line.  When asked if he understood the rights that had just been read to him, Mr. Terry said that this was not his first go around with law enforcement, and he would not sign or initial the form but was willing to talk.  As a result, the consent form is signed only by

Agents Schwartz and White as witnesses. On Mr. Terry's signature line appear the words "verbal only," which were meant to signify that the defendant understood his rights and had verbally consented to speak to the agents, but would not sign the form. Agent White testified that, during his interview, the defendant was calm and cooperative, did not appear physically or mentally impaired, and was never threatened or promised anything. At no point during the interview did the defendant ask for a lawyer or request that questioning be stopped. However, the agents never asked the defendant if he understood that his statements could be used against him, even after he had refused to sign the form.

Defendant testified that, on the morning of February 28, 2012, the DEA agents approached his vehicle with guns drawn as he was attempting to park in front of his home, told him he was under arrest and ordered him out of his vehicle. The agents asked him for permission to search his house and to sign the consent to search form, both of which he refused. (Tr. 51.) Later, defendant contradicted this testimony somewhat by saying he was not sure what form he was shown because, knowing he would not sign anything, he paid little attention to it. (Tr. 53.) Defendant further testified that during the arrest and in response to a question, he told the officers there was someone else in his apartment at that time. Specifically, defendant testified that Ena Carson, his son's mother, was in his house at that time, but did not live there. Ms. Carson had sole custody of their son, but she and Mr.

Terry agreed that the child would live with Mr. Terry because Ms. Carson worked nights. Nevertheless, the child was not with Mr. Terry all the time because he spent most of his time working out of town. Defendant also said that Ms. Carson never came to his house after school to spend time with their son. (Tr. 72.)

Mr. Terry's explanation for Ms. Carson's presence at his home that particular morning was confusing. Defendant said Ms. Carson arrived at 3:00 or 4:00 a.m., though he could not recall if he was expecting her at that hour or if he asked her why she was there. He also could not recall whether he was asleep or awake when she arrived, but knows that she was dressed in regular clothes at the time. On cross-examination, he testified that he did not recall her ever wearing a bathrobe at his home and has no idea where the bathrobe came from. On redirect, when he was asked if there was a bathrobe in a house that she could have put on after he was gone, he responded, "Yeah, probably so." (Tr. 79.)

After entering the house, Ms. Carson went upstairs to her son's bedroom to sleep. The defendant was not sure why Ms. Carson came over that morning, though he said she may have wanted to take their son to school that day to meet with his teacher or something. In any event, defendant said he ended up taking the child to school that day. (Tr. 52.) Defendant could not recall how many times Ms. Carson had taken their son to school before but that she had never done so from his house. (Tr. 69.)

According to the defendant, Ms. Carson did not live at or pay rent for his home, had no belongings there and had no authority to allow anyone to enter or search it. On cross-examination, however, he admitted that he never actually spoke to her about these particular topics. Further, it is clear from his testimony that defendant left Ms. Carson in sole possession and charge of the apartment when he left to take their son to school.

Defendant admitted that the agents showed him the *Miranda* rights form when he was being questioned at 230 South Dearborn after the arrest. (Tr. 52.) Moreover, though he initially said he could not recall the agents reading the *Miranda* rights form to him, after further questioning, he admitted that the agents read it to him and he understood the words they read. He did not ask the agents any questions about the rights that were read to him and spoke to the agents after they read him his rights.

In this respect, the case is unusual in that the defendant does not contest the fact that or the manner in which he was advised of his rights. Instead, he seems to claim that the information in the DEA's *Miranda* form did not effectively apprise him of those rights. (*See* Tr. 54 (defendant testifying that he did not "agree" with any of the statements read to him from the *Miranda* form and did not agree to sign it.).) He contends that he did not sign the *Miranda* form because he did not wish to waive his rights and believed that not signing the form would preserve them.

Defendant's testimony about his interpretation of his rights conflicts with the agents' testimony that he said he understood his rights because this was not his first run in with the law. That was an understatement. Since age 18, defendant has been arrested more than 17 times for battery (ages 18 and 26), disorderly conduct and possession of a firearm (age 20), possession of narcotics (age 21), possession of cannabis and defacing identification (ages 25, 26, 28, and 29), domestic battery (age 29), attempted possession of a controlled substance (age 30), drinking alcohol on a public highway (age 32), and possession of a controlled substance, distributing drugs while in possession of a firearm and federal money laundering (age 39). (Tr. 58-60; Terry Criminal History.) The defendant has been convicted four times for disorderly conduct and possession of a firearm (20), defacing identification (age 25), and federal money laundering (age 39). (Tr. 59-60; Terry Criminal History). In the arrest immediately preceding this one, for federal money laundering, defendant not only gave several statements to the FBI, but agreed to cooperate against a codefendant and received a reduced offense level for his cooperation. (Tr. 60-61.) He was awaiting sentencing and under court supervision, which included electronic monitoring, in that case when he was arrested in this one. Thus, the agents' testimony that defendant said because of his

prior experience with law enforcement he understood his rights and would talk to them but not sign anything is entirely credible. [1]

Second, Mr. Terry's reasoning makes little sense, as he was told he had the right to remain silent, not the right to speak and answer questions provided he did not sign a waiver form. Indeed, the entire import of the form that was read to him is that he could either exercise his right to remain silent or answer questions freely and voluntarily. The form, entitled "YOUR RIGHTS," states that: (1) he has the right to remain silent; (2) if he chooses to speak, anything he says can be used against him in court; (3) he has the right to have an attorney with him before and during any questioning; and (4) at the end, asks if he understands his rights and is willing to answer questions. The form in no way implies that he can freely and voluntarily answer questions but still preserve his right to remain silent. Yet that is exactly what defendant claims he thought he could do -- preserve his right to remain silent by talking.

Finally, even if he had never before been arrested, the defendant, a 40-year-old man who owns a business, has a high school diploma and two years of college education, including a year studying criminal justice, has to have known what the simple, unambiguous words read to him meant.

---

[1] Defendant steadfastly denied that he was given his *Miranda* rights by federal agents in the money laundering case, and said he had never before seen a written *Miranda* waiver/consent form and could not recall how many times he had been given his *Miranda* rights in connection with his prior arrests. (Tr. 63.) The Court finds this testimony incredible.

Defendant's attempt to distinguish between giving a "written statement" and merely answering questions is also unavailing. (*See* Tr. 57 (testifying that he believed none of his statements could be used against him because he never signed the form "or . . . gave any written statement with my signature").) The *Miranda* rights form that defendant admits was read to him specifically states that he has a right not to answer questions and "anything" he "say[s]" can be used against him. The form does not even contain the words "written" or "statement." Thus, there is no basis for defendant's purported conclusion that just pointing out mistakes in his codefendants' statements, without signing a written statement of his own, immunized him from his verbal statements. More credible is the conclusion that the defendant was attempting to talk his way out of an arrest, while at the same time keeping his ability to later deny any of the statements he made to the arresting agents by putting nothing in writing. Someone with defendant's experience and knowledge in criminal matters would clearly be aware that a prior written statement or express waiver would have much greater probative value than mere verbal statements which he could later deny.

In short, given defendant's arrest record, his level of sophistication, and the lack of testimony that he was ever told or had a basis for believing that no statements made to law enforcement officers could be used against him if he had not signed a written waiver form, his testimony to the contrary is simply not

credible. Accordingly, the Court finds that defendant's response to the interviewing agents and subsequent statements to them were a clear and unequivocal waiver of his right to remain silent. *See United States v. Sanchez*, No. 12-20008, 2013 WL 4807019, at **4-8 (C.D. Ill. Sept. 9, 2013)

We turn now to the defendant's motion to quash evidence seized during the search of his home. To justify the search of defendant's home, the government must prove by a preponderance of the evidence that there exists an exception to the requirement that a warrant be issued upon probable cause before a residence may be searched. *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). Knowing and voluntary consent to a search is one such exception. *Id*. at 834. The consent of one who has or appears to have common authority over the premises is valid as against the absent, non-consenting person with whom that authority is shared. *United States v. Jackson*, 598 F.3d 340, 346 (7th Cir. 2010) (citations and quotation marks omitted). Thus, Ms. Carson's consent was effective only if she had actual or apparent authority to consent to the search of defendant's home. *United States v. Matlock* , 415 U.S. 164, 165-66 (1974). "Where a defendant allows a third party to exercise actual or apparent authority over the defendant's property, he is considered to have assumed the risk that the third party might permit access to others, including government agents." *Basinski*, 226 F.3d at 834.

Among the factors to relevant to the actual or apparent authority analysis

are: (1) possession of a key to the premises, (2) a person's admission that she lives at the residence, (3) possession of a driver's license listing the residence as the driver's legal address, (4) receiving mail and bills at the residence, (5) keeping clothing at the residence, (6) having one's children reside at the residence, (7) keeping personal belongings such as a diary or a pet at the residence, (8) performing household chores there, (9) being on the lease and/or paying rent for the premises, and (10) being allowed into the home when the owner is not present. *United States v. Groves*, 530 F.3d 506, 509 (7th Cir. 2008). In determining whether a third party such as Ms. Carson had apparent authority to consent to a search, law enforcement agents need not be correct, only reasonable. *See Brinegar v. United States,* 338 U.S. 160, 176 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."). Apparent authority exists if "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 88 (1990) (citations and internal quotation marks omitted).

The agent executing the warrant succinctly stated that he believed Ms. Carson lived at the home and/or had the authority to consent to its search because:

(1) she answered the door before 10:00 a.m., dressed in a bathrobe, suggesting that she had been there overnight; (2) no one else was in the home, and she had sole control of it; (3) she did not hesitate to let the agents inside or sign the consent to search form; and (4) she was sufficiently acquainted with the defendant to recognize that an incoming phone call was from his mother. However, he also said that he did not inquire about Ms. Carson's authority to consent until the search was in progress, and when he did, learned that that she did not live there, though her son did. Moreover, the search revealed that there was children's clothing, but not women's clothing in the house, though it is unclear at what point during the search this became obvious.

If defendant's testimony is credited, he was asked to consent to a search of his home at the time he was arrested and refused to do so. Agent Laverty, on the other hand, testified that the defendant was not asked to consent to the search when he was arrested because the agents wanted to limit public exposure of the arrest to enhance the likelihood that defendant would cooperate in their investigation. Further, Agent Laverty said the defendant was not asked if there was anyone else in the residence when he was arrested. The defendant, on the other hand, said the agents asked and he told them that someone was in his house. (Tr. 51.) Even if defendant refused consent at the site of the arrest, Ms. Carson's consent at the

premises would trump that remote refusal. Thus, the existence of defendant's consent is not the crucial determinate.

The case at bar is one of the ambiguous situations referenced in *Brinegar*. Ms. Carson was clearly permitted to be home when the owner was not. Indeed, she was the only person there when defendant was arrested and any actions that needed to be taken immediately would have to have been taken by her until the defendant's return. In addition, her child resided at that address. She appeared dressed in a manner which indicated she was more than a mere temporary guest and she exhibited no hesitancy in exercising control over the premises by allowing the officers to enter and consenting to the search.

Though defendant emphasized that Ms. Carson was not a frequent visitor to the home and never before stayed overnight, there is some reason for doubting this testimony. First, Ms. Carson had sole custody of the child living in defendant's home. Defendant further testified that she may have had a bag with her with a robe in it on the relevant morning and he did not question her when she appeared at the apartment at 3:00 or 4:00 a.m. to sleep. On cross-examination, defendant admitted that she had been over to the home before. Even if defendant's testimony is true, however, the question is not whether she, in fact, lived at his house but whether, when she consented to the search, she appeared to have the authority to do so. At that time, the agents saw a person whose appearance and attire suggested that she

lived or stayed at that address as more than just a casual visitor. Although after she signed the consent and the search had begun, Ms. Carson told the agents that she did not live there, all of the other factors in their knowledge at the time would lead a reasonable person to conclude that Ms. Carson had the authority to consent to a search of the premises. *See United States v. Duran,* 957 F.2d 499, 505 (7th Cir. 1992).

For the reasons stated above, defendant's motions to suppress his post-arrest statements and evidence recovered pursuant to the search of his home [79, 80] are denied.

**Date:** April 21, 2014

_____
**Ronald A. Guzmàn
United States District Judge**